UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE
CRIMINAL ACTION NO. 3:22-CR-00085

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.

JOSHUA JAYNES, *et al*                                                    DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motions to Dismiss the felony charges contained in Count One of the Superseding Indictment. The Superseding Indictment represents the Government's renewed effort to sufficiently plead felony offenses under 18 U.S.C. § 242. Section 242 makes it a crime for anyone acting "under color of any law" (such as a law enforcement officer) to willfully subject any person to the deprivation of a right secured or protected by the United States Constitution or other federal law. Defendants, Joshua Jaynes and Kyle Meany, are two former Louisville Metro Police Department officers. They are accused of aiding and abetting the deprivation of Breonna Taylor's Fourth Amendment right to be free from unreasonable searches and seizures in violation of § 242 and 18 U.S.C. § 2(b).

The crux of this alleged crime is a lie, one that is very concerning to the Court. According to the Superseding Indictment, defendants lied to a Jefferson County state court judge in order to obtain a search warrant for Breonna Taylor's apartment. Jaynes is accused of drafting a warrant affidavit based on affirmative lies and lies by omission. Defendant Meany is accused of knowing the affidavit was built on such lies and approving its submission to the state court judge anyway. If proven at trial, the falsities of which Defendants stand accused should not be condoned. They would lead to the execution of a warrant that was not otherwise supported by probable cause. Such allegations strike at the core of Americans' rights to be secure in their persons and effects, free

from arbitrary invasions of their homes by police—basic rights protected by the Fourth Amendment to the Constitution.

The Government seeks to vindicate Taylor's Fourth Amendment rights by prosecuting defendants Jaynes and Meany pursuant to 18 U.S.C. § 242. This criminal statute is drawn broadly. It punishes all Governmental actors who subject someone to a violation of any federally established law. Basic violations of § 242 are misdemeanors because they are punishable by a fine or imprisonment of "not more than one year, or both." *Id.* Section 242 also establishes harsher penalties. Those are reserved for situations in which bodily injury or death results from the "acts committed in violation of" § 242 or for situations in which the perpetrator of the § 242 crime used, attempted or threatened violence to carry out the crime. These provisions are called penalty enhancements because they increase the time one may serve for having violated § 242.

The first penalty enhancement sets a maximum prison term of ten years. The second one sets a maximum prison term of life. Because they set prison terms of more than one year, the penalty enhancements effectively establish felony offenses. The penalty enhancements are more narrowly drawn than is the misdemeanor offense. They are limited to specific types of injury or violence and the severity of the violence or injury dictates to which maximum term of imprisonment a guilty party is subject. The ten-year enhancement applies if bodily injury resulted from the acts committed in violation of § 242 or if those acts included "the use, attempted use, or threatened use of a dangerous weapon, explosives or fire." The life-imprisonment enhancement applies if a death resulted from the acts committed in violation of § 242 or those acts included "kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill." The Government has invoked both enhancements, seeking to severely punish defendants Jaynes and Meany. In the Government's view, Jaynes' and Meany's

conduct warrants severe punishment because police should never have been at Taylor's door and had they not been, she would be alive today.

There are two chief obstacles to the Government's goal. First, § 242 does not provide harsh punishment for the alleged lies that brought officers to Taylor's door. Second, the Government's liability theories overlook the events which took place while officers were carrying out the warrant. It is those events that ultimately determine whether either of the penalty enhancements apply here. It bears repeating that the Court is seriously troubled by the claimed falsehoods which root the charges in this case. At the same time, the Court must follow the law that the Government has invoked (§ 242) and must rule based on the fact allegations in the Superseding Indictment. Given certain newly disclosed fact allegations and the lack of necessary fact allegations, the Court concludes that neither of § 242's penalty enhancements apply in this case.

According to the Government, defendants Jaynes and Meany violated Taylor's rights "by obtaining a search warrant for her home that they knew lacked probable cause and sending a different group of officers to execute it in a dangerous manner." Resp., DN 63, at PageID# 1168. If police enter a person's home without probable cause or other justification, they violate that person's Fourth Amendment rights. Police must also enter a person's home in a reasonable manner and any subsequent search must be conducted in a reasonable manner. If the manner of entry or manner of search is unreasonable, police violate the Fourth Amendment. Entering without a proper justification and searching in an unreasonable manner are distinct types of Fourth Amendment violations. *Cnty. of L.A.,, Calif. v. Mendez*, 581 U.S. 420, 431-32 (2017) (contrasting entry without a warrant with manner of entry violation); *Hudson v. Mich.*, 547 U.S. 586, 593 (2006) (same). Thus, under § 242 each type of violation would be a separate crime, requiring the Government to

3

plead facts that establish each basic crime, and each such crime must be treated and analyzed separately by the Court. *Mendez*, 581 U.S. at 431-32.

Next, the Government argues that guns were used, exposing Jaynes and Meany to § 242's ten-year penalty enhancement. Resp., DN 63, at PageID# 1177-82. The Superseding Indictment alleges that guns were used in two ways: (1) officers brandished them to execute the warrant, Sup. Indictment, DN 52, at Count One and (2) two officers fired their weapons after being fired upon. *Id.* at ¶ 38. These allegations do not, however, establish that guns were used to commit a § 242 crime. Officers returned fire to self-defend, not to commit a § 242 crime. The allegations in the Superseding Indictment also show that officers did not "brandish" their weapons to induce Taylor to let them in or to gain her compliance with a subsequent search. Taylor heard no police commands and no gun was ever pointed at Taylor to induce her compliance. Taylor was asleep when officers broke through her door. She never heard them demand entry and she was fatally wounded just "moments" after they entered her apartment. Sup. Indictment, DN 52, at ¶¶ 36-38.

Next, the Government has alleged that "the offense resulted in Taylor's death." Sup. Indictment, DN 52, at Count One. This allegation exposes Jaynes and Meany to § 242's life-in-prison penalty enhancement. 18 U.S.C. § 242. At the same time, its phrasing has introduced confusion into this case. By referencing "the offense," it is unclear whether the Government means to state two § 242 crimes (an illegal entry and an illegal manner of entry) or whether it means to state only an illegal entry crime. This confusion is compounded by the Government's causation arguments which appear to conflate the two distinct crimes. At the same, certain allegations in the Superseding Indictment undermine the assertion that the manner of the entry by police violated the Fourth Amendment. Even so, because the Government has argued about the "manner of entry," the Court has reviewed the Superseding Indictment and the Government's arguments as if the

Government meant to proceed on two Fourth Amendment § 242 crimes: (1) an illegal entry and (2) an illegal manner of entry. Further, as it must, the Court has analyzed those crimes separately.

Unlike the original Indictment, the Superseding Indictment expressly pleads that the police knocked, announced, and waited before they went through Taylor's door. Sup. Indictment, DN 52, at ¶¶ 35-37. Instead, of supporting an unreasonable (and thus illegal) manner of entry, these allegations show that the officers complied with the Fourth Amendment by obeying its knock-and-announce rule. *U.S. v. Finch*, 998 F.2d 349, 353 (6th Cir. 1993). And, if there is no Fourth Amendment violation based on the manner of entry, then there is no § 242 crime to which to attribute Taylor's death. This is so because the Government cannot attribute Taylor's death to the lack of a warrant supported by probable cause.

If police had had probable cause, nothing would change here. According to the Government's case, both K.W. and Taylor were asleep when police knocked and announced. Neither heard them. Hence, K.W. believed intruders had come in and so he fired upon them. They returned his fire and one of those bullets fatally wounded Taylor. These facts are not in dispute. And, according to the Government, just as K.W.'s shooting at the officers was a legal act so was the officers' return fire. Thus, this is not a case of excessive force. Nor is it a case of police brutality. Nor is it a case of officers' misapprehending a need to self-defend. Instead, the fact allegations contained in the Superseding Indictment show that this is a case of legal, lethal and tragic crossfire that was not initiated by the police. As such, it is case to which § 242's penalty enhancements do not apply.

## I. BACKGROUND AND PROCEDURAL HISTORY

Like the present charges, the original Indictment charged Jaynes and Meany with violating § 242 based on procuring an invalid warrant. The original Indictment also alleged that Jaynes manufactured probable cause based on affirmative lies and lies by omission and it alleged that

Meany knew as much but they went forward anyway. Indictment, DN 1, at ¶ 7 & Count One. Unlike the Superseding Indictment, with respect to the "use of dangerous weapon," the original Indictment alleged that Jaynes and Meany knew "the warrant would be executed by other armed LMPD officers," *Id.* at Count One. Additionally, the Indictment was sparse as to what happened at Taylor's apartment, alleging only that when "officers broke down the door to the apartment . . . K.W. believing that intruders were breaking in, immediately fired one shot . . . hitting the first officer at the door." *Id.* at ¶ 9. The officers returned his fire and one of those bullets lethally wounded Taylor. *Id.* at ¶¶ 9-10. Based on these allegations, Count One alleged that "[t]he offense involved the use of a dangerous weapon and resulted in Taylor's death." *Id.* at PageID# 3. This last allegation amounted to charging Jaynes and Meany with felony offenses under both § 242 penalty enhancements.

On Defendants' motions, the Court dismissed those felony charges from the Indictment, leaving the misdemeanor charge in place. 08/22/2024 Mem. Opinion, DN 49. In response, the Government appealed. Later, as a result of obtaining the Superseding Indictment, the Government dropped its appeal. Defendants have again moved to dismiss the felony charges pursuant to FED. R. CRIM. P. 12(b)(3) (DNs 61 & 62). The Government has responded (DN 63) and Defendants have replied to that Response (DNs 64 & 65). Thus, the Motions are ripe for decision. As indicated, the Court concludes that the Superseding Indictment has not resuscitated the § 242 felony charges. To understand why not, it is helpful to know the Court's rationale for dismissing those felony charges in the first instance. For that reason, below, the Court summarizes its previous decision and then turns its attention to the new allegations and the parties' arguments.

First, however, the Court pauses to address the Government's aiding-and-abetting theory of criminal liability. That theory adds a layer of complexity to this case. Thus, explaining the

applicable aiding-and-abetting law helps clarify the Court's analysis. More specifically, explaining that law aids discussion of the Government's allegations which are couched in terms of what Defendants "knew." An explanation also elucidates why some of the Government's arguments miss the mark. For these reasons, the Court begins with 18 U.S.C. § 2(b) aiding and abetting.

## A. Aiding and Abetting, 18 U.S.C. § 2(b)

Commission of a crime requires intent plus an act or failure to act. *U. S. v. Lester,* 363 F.2d 68, 73 (6th Cir. 1966), *cert. denied,* 385 U.S. 1002 (1967) ("There must be a joint operation of act, or failure to act, and intent."). At the same time, the "essential element of criminal intent" need not "always reside in the person who does the forbidden act." *Id*. The one who does the forbidden act may do so without any criminal intent whatsoever while the intent—willfulness—may reside in another. *Id.* In such cases, "the 'joint operation of act and intent'" necessary "to the commission of the crime is provided by the person who willfully causes the innocent actor to commit the illegal act." *Id.* This is the rule established by 18 U.S.C. § 2(b). Section 2(b) states: "Whoever willfully causes an act to be done, which if directly performed by him or another would be a crime against the United States is punishable a principal." Here, the rule roughly operates like this: while the criminal intent to search Taylor's apartment without probable cause resided in Jaynes and Meany, the forbidden entry into her home was committed by different officers who were ignorant of the fact that the warrant was not supported by probable cause.

What it means to "willfully cause" another to do something for purposes of § 2(b) is what adds complexity to this case. The Superseding Indictment pleads this "willfully caused" intent element by alleging that Defendants "knew" that an act necessary to complete the crime would take place. For example, the new charges allege that Defendants knew the warrant would be executed despite the lack of probable cause. The crime is the execution of the warrant without probable cause. What Defendants "knew" or foresaw goes to intent under § 2(b). *See U.S. v.*

*Murph*, 707 F.2d 895, 896 (6th Cir. 1983) (per curiam) (defendant could be convicted under 18 U.S.C. §§ 2(b) and 287 for submitting false return when although he did not personally file false return, he understood or foresaw that tax discounter to whom he sold return would file it).

Defendants' present motions to dismiss do not challenge whether the Superseding Indictment sufficiently pleads § 2(b) intent. Instead, they raise this somewhat less complex issue: why the Government need not plead that the defendants personally performed the acts that completed the § 242 crime(s). At the same time, some of the Government's arguments appear to conflate the notion of foreseeability for purposes of establishing § 2(b) intent with what suffices to plead the felony offenses established by § 242's penalty enhancements. For these reasons, the Court has paused to explain § 2(b).

## B. The Previous Indictment and the Court's Decision to Dismiss the Felony Charges

As noted above, § 242 criminalizes the deprivation of civil rights by someone who was acting under color of law. The statute first defines that substantive offense which is punishable by imprisonment of no more than one year. As such, it is a misdemeanor. Then, by way of penalty enhancements, § 242 establishes two felony offenses, the first punishable by up to ten years' imprisonment and the second punishable by up to life imprisonment. One can be convicted of the first felony offense "if bodily injury results from the acts committed in violation of this section [§ 242] or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire." 18 U.S.C. § 242. One can be convicted of the second felony offense "if death results from the acts committed in violation of this section," § 242. Altogether, and in pertinent part, § 242 states:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State . . . to the deprivation of any rights . . . secured or protected by the Constitution . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts

> include the use, attempted use, or threatened use of a dangerous weapon . . . shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section . . . shall be fined under this title, or imprisoned for any term of years or for life . . . .

18 U.S.C. § 242.

Count One of the Indictment charged Jaynes and Meany as follows:

> On or about March 12, 2020, in the Western District of Kentucky, **JOSHUA JAYNES** and **KYLE MEANY**, while acting under color of law and while aiding and abetting each other and other officers, willfully caused Breonna Taylor to be deprived of the right, secured and protected by the Constitution and laws of the United States, to be free from unreasonable searches and seizures. Specifically, **JOSHUA JAYNES** drafted and swore out a warrant affidavit for Taylor's home, knowing that the warrant would be executed by other armed LMPD officers, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause. **KYLE MEANY** approved the warrant affidavit for Taylor's home, knowing that the warrant would be executed by other armed LMPD officers, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause. The offense involved the use of a dangerous weapon and resulted in Taylor's death.

Indictment, DN 1, at Count One.

The Court struck the final sentence of Count One, thereby dismissing the felony charges. First, the Court found that for purposes of § 242's ten-year penalty enhancement, "use" meant more than mere possession of weapon. Thus, the allegation that the officers who executed the warrant were "armed" did not plead "use." The Government had also relied on officers' returning K.W.'s fire as satisfying "use of a dangerous weapon" under § 242. The Court disagreed, finding that the return fire was an act of self-defense and not done to carry out a § 242 crime. Accordingly, the Court dismissed the dangerous-weapon felony charge. 08/22/2024 Mem. Op. and Order at PageID# 912-18.

9

Next, the Court addressed the "death results from" penalty enhancement. After finding that the phrase "results from" requires showing both actual and proximate cause, the Court examined the Indictment in light of the traditional legal tests for each type of causation. The test for actual cause requires the Court to ask whether the injury would have occurred but for the illegal conduct. The illegal conduct was the lack of probable cause for a search. Yet, there were no allegations to suggest that if police had had probable cause when they entered, different events would have taken place. Instead, the Indictment alleged that K.W. was surprised by the entry, thought police were intruders, so he immediately shot at them. They returned his fire which lethally wounded Taylor. Indictment, DN 1 at ¶¶ 9-10. The Court found that the existence of probable cause would not have altered these events because its presence would not have prevented K.W.'s surprise, the impetus for his opening fire which caused officers to fire back. Thus, the Court found that Taylor would have died even if there were probable cause to search her apartment.

Next, the Court turned to proximate cause. Proximate cause is a legal construct. Its function is to impose limits on liability for harmful, even deadly, acts. The scope and purpose of the specific legal rule or law that was broken sets those limits. In turn, the limits themselves are spoken of as the scope of risk or the interests which the particular law is meant to protect. This is true for cases involving constitutional rights. Thus, in constitutional cases, proximate cause is evaluated and discussed in terms of the scope of risk created by violating the particular constitutional right. 08/22/2024 Mem. Opinion. at PageID# 926 (citing *Carey v. Piphus,* 435 U.S. 247, 259 (1978) (addressing analogous tort claims under 42 U.S.C. § 1983) and *Paroline v. U.S.*, 572 U.S. 434, 444 (2014) (proximate cause analysis in criminal and tort law "is parallel in many instances")). This scope-of-risk part of the rule is also discussed in terms of foreseeability. *Id.* (citing *Paroline*, 572 U.S. at 445). If the injury at issue falls within the risks created by violating the constitutional right

10

at issue, then the injury is "foreseeable." In addition to being foreseeable in this sense, there "must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Id.* (quoting *Paroline*, 572 U.S. at 444).

The Fourth Amendment's warrant clause established the constitutional right at issue. The warrant clause states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend IV. The purpose of the warrant clause is to shield "persons, houses, papers, and effects" from the Government's scrutiny. *Hudson*, 547 U.S. at 593. As such, it protects privacy. It does not guard against violent encounters. 08/22/2024 Mem. Opinion at PageID# 927 (citing cases). A different rule of law guards against violent encounters. *Id.* That rule is known as the knock-and-announce rule. *Id.* (citations omitted). It too is a Fourth Amendment right. However, the Indictment charged only a violation of the warrant clause. Thus, the question became whether Taylor's death bore some direct relation to the purpose served by the warrant clause. It did not. Again, the warrant clause's purpose is to protect privacy, not life and limb. Stated in terms of foreseeability, one can foresee that a violation of the warrant clause, searching someone's home without probable cause, would result in an illegal invasion of privacy but not in someone's death. *See id.* at PageID# 926-28.

The Court's analysis did not end there, however. The Court turned to Defendants' argument that under the law, K.W.'s shooting at the officers was the proximate cause of Taylor's death. That assertion rested on another legal doctrine known as superseding cause. Superseding cause is also a legal construct. Like proximate cause, it limits liability for harmful, even deadly, acts. Superseding cause is a type of "intervening cause." An intervening cause is an act or force which actively operates in producing harm to another after the initial wrongdoer's act has taken place. A "superseding cause" is an intervening cause which the law considers sufficient to override the

initial wrongdoer's unlawful conduct, thereby relieving him of liability for the harm, or injury, at issue. CAUSE, Black's Law Dictionary (12th ed. 2024).

For example, when a third person usurps control of a situation and his intentional act brings about the injury at issue, that act is often deemed the superseding, or legal, cause of the injury. In relationship to the injury, the third party's act has altered the sequence of events, taking over and setting in motion events that ultimately lead to the injury, thereby becoming the causal event which is most directly related to the injury. Such a third-party act is viewed as the immediate cause. Also, in the eyes of the law, it is seen as outweighing (superseding) the prior unlawful conduct such that it becomes the legal cause (the proximate cause) of the injury. The rule operates this way even if the initial wrongdoer's act was a substantial factor in bringing about the harm. *Powers v. Hamilton Cnty. Public Defender Com'n*, 501 F.3d 592, 610 (6th Cir. 2007).

The original Indictment alleged that K.W. opened fire and drew return fire as a result. Indictment, DN 1 at ¶ 9. Thus, even if one sympathizes with K.W.'s conduct, it remains that his firing first directly caused officers to self-defend by return fire. Accordingly, the Court found that K.W.'s act superseded the prior unlawful conduct and so constituted the proximate cause of Taylor's death.[1] This holding is consistent with Sixth Circuit decisions. 08/22/2024 Mem. Opinion, DN 49 at PageID# 930 (discussing *Estate of Sowards v. City of Trenton*, 125 F. App'x. 31, 42 (6th Cir. 2005) (illegal entry not proximate cause of death because officers' firing at suspect was reasonable response to his having pointed his handgun toward officers); *id.* at PageID# 932 (discussing *Whitlow v. City of Louisville*, 39 F. App'x 297 (6th Cir. 2002) (pointing gun at officers who then fired upon deceased was proximate cause of death, not alleged tortious events leading

---

[1] By way of further explanation, proximate cause requires the Government to link the alleged unlawful conduct to the resultant injury. Accordingly, the series of events that precede an injury, or death, are often described as a chain of events. Acts which occur subsequent to the unlawful conduct that are more directly linked to the resulting injury, or not at all linked to the unlawful conduct, are said to "break the chain of causation."

up to standoff)). In sum, the Court found that even if the Indictment had adequately pleaded that the illegal entry was the actual and proximate cause of Taylor's death, it also fatally pleaded a superseding cause of her death. Accordingly, the Court dismissed the second felony offense, the "death results from" charge. *Id.* at PageID# 937.

## C. The Superseding Indictment

On October 1, 2024, the Government filed a Superseding Indictment (DN 52). Not much changed in Count One. The rights violation is the same. However, instead of alleging that the defendants knew that the on-scene officers would be "armed," Count One states that they knew those officers would "brandish" their weapons. Finally, Count One specifies that that the offense "included" the use of a weapon because officers brandished their weapons and retuned K.W.'s fire. Count One now reads as follows:

> On or about March 12-13, 2020, in the Western District of Kentucky, **JOSHUA JAYNES** and **KYLE MEANY,** while acting under color of law and while aiding and abetting each other and other officers, willfully caused Breonna Taylor to be deprived of the right, secured and protected by the Constitution and laws of the United States, to be free from unreasonable searches and seizures. Specifically, **JOSHUA JAYNES** drafted and swore out a warrant affidavit for Taylor's home, knowing that the warrant would be executed at night by other LMPD officers brandishing firearms, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause. **KYLE MEANY** approved the warrant affidavit for Taylor's home, knowing that the warrant would be executed at night by other LMPD officers brandishing firearms, and knowing at the time that the affidavit contained false and misleading statements, omitted material information, relied on stale information, and was not supported by probable cause. The offense included the use of a dangerous weapon, to wit, from officers (1) brandishing their weapons to execute the warrant and (2) firing their weapons after officers surprised an armed occupant in the home; and the offense resulted in Taylor's death.

> All in violation of Title 18, United States Code, Section 242 and 2(b).

Sup. Indictment, DN 52, at PageID# 954-55.

Defendants argue that the last sentence of Count One should again be stricken so as to again dismiss the felony charges. Jaynes makes two arguments for dismissal: (1) Jayne's individual conduct did not include the use of a dangerous weapon and (2) K.W.'s opening fire remains the legal cause of Taylor's death. Meany makes like, although not entirely identical, arguments for dismissal: (1) there are no allegations showing that any officers used weapons to commit the crime such that he cannot be held liable under § 242's ten-year penalty enhancement and (2) K.W.'s shooting remains the legal cause of Taylor's death such that Meany cannot be held liable for Taylor's death. Jaynes has adopted Meany's arguments. Mot. to Dismiss, DN 62 at n.1. In response, the Government contends that the felony charges must proceed to trial, asserting that the Defendants' arguments ignore the new fact allegations and their arguments fail as a result. Additionally, the Government argues that the Superseding Indictment cures the prior problems that resulted in dismissal of the felony charges, thereby removing any impediment to a trial. The Court addresses the parties' arguments below.

## II. ANALYSIS

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). "To be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *U.S. v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992) (citing *Fleisher v. U.S.,* 302 U.S. 218 (1937) (per curiam)). The Court must "accept the factual allegations as true, and construe those allegations in a practical sense with all of the necessary implications." *U.S. v. Reed,* 77 F.3d 139, 140 n. 1 (6th Cir. 1996) (*en banc*). Thus, on a motion to dismiss, the Court accepts the facts alleged and decides if those facts establish the defendant's commission of the crime. "If the indictment is legally deficient, the proper result is dismissal . . . ." *U.S. v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001).

**A. The Use-of-a-Dangerous-Weapon Charge**

The Court previously held that for purposes of § 242's ten-year penalty enhancement, "use of a dangerous weapon" means the active employment of a dangerous weapon. Mere possession does not suffice. Thus, the Court rejected the Government's contention that the on-scene officers' being "armed," as alleged in Count One of the Indictment, satisfied § 242.[2] The Government now agrees that "use of a dangerous weapon" means active employment of a weapon.[3] It contends that the Superseding Indictment alleges active use by asserting that officers brandished their weapons. The Government also repeats its assertion that the officers' return fire satisfies the definition of "use" under § 242. Defendants disagree. Jaynes argues that the plain language of § 242 requires a showing that he personally used a weapon. Meany makes a like contention. Meany also argues that there are no allegations which show use of a weapon to commit a § 242 crime, requiring dismissal. While the defendant's personal-use argument lacks merit, they are correct that the Superseding Indictment fails to allege facts which show that officers used their weapons to commit or, more exactly, to complete a § 242 crime.

**1. Personal Use of a Weapon Argument**

The pertinent part of § 242's ten-year penalty enhancement reads: "if the acts committed in violation of this section . . . include the use, attempted use, or threatened use of a dangerous weapon," then the defendant "shall be fined under this title or imprisoned not more than ten years, or both." 18 U.S.C. § 242. Jaynes argues that the word "include" restricts the penalty enhancement's application to a defendant's personal conduct "since it describes a necessary condition of the *defendant's* actions." Mot., DN 62, at PageID# 1160 (emphasis in original). This

---

[2] Resp., DN 40, at n.3. The Government also argued that the officers' return fire satisfied § 242. *Id.* The Court rejected that argument too. 08/22/2024 Mem. Opinion at PageID# 917.
[3] Resp., DN 63, at PageID# 1179 ("The Government agrees that the mere fact that an officer was carrying a service weapon at the time of an unlawful act does not constitute a 'use' under § 242.").

argument overlooks the fact that Jaynes has been charged with aiding and abetting the use of a dangerous weapon. That is, Jaynes has not considered the application of 18 U.S.C. § 2(b). His argument, and Meany's to the extent he makes the same one, is unavailing for that reason. The Government need not allege that a defendant's personal conduct included active employment of a weapon, *i.e.*, "use" under the ten-year penalty enhancement. They can be charged with "use of a dangerous weapon" based upon the acts of officers at the scene if those acts complete the commission of the charged crime and if the Government proves § 2(b) intent. *See infra*, § I.A. Thus, the charge is sound in theory. It is not sound in practice, however, because the "use" allegations again fall short.

### 2. Failure to Allege Use

As the Court previously held, to constitute "use" under § 242, a dangerous weapon must have been actively employed "to commit the base offense as opposed to having been used for a different purpose." 08/22/2024 Mem. Opinion at PageID# 915. That is, the particular use to which (or the purpose for which) the weapons are actively employed matters. The statute makes this clear. Section 242 speaks to what happened, not what might have happened. It asks first whether the defendant did subject someone to a constitutional rights violation and then asks whether he used a dangerous weapon to do so. In pertinent part, § 242 reads:

> **(1)** Whoever, under color of any law . . . willfully subjects any person . . . to the deprivation of a right secured or protected by the Constitution . . . shall be fined under this title or imprisoned not more than one year, or both . . . **(2)** and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon . . . shall be fined under this title or imprisoned not more than ten years . . . .

18 U.S.C. § 242 (numbering added for ease of reference).

The first clause requires the Government to prove that the defendant took a specific action against a specific person.[4] The statute speaks of willfully subjecting a person to the deprivation of a right defined by the Constitution. Used as a transitive verb, as it is in § 242, "subject" means "to cause to undergo or to submit: make submit to a particular action or effect: expose." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2275 (Philip B. Grove, *et al*) (1986) (defining "subject"). Thus, to allege and prove defendants "willfully subjected" Taylor to a § 242 violation, the Government must show that the "aim was . . . to deprive [Taylor] of a right and that right was protected by the Constitution." *Screws*, 325 U.S. at 106. The Government has alleged that such intent resided in Jaynes and Meany: "Joshua Jaynes and Kyle Meany . . . willfully caused Breonna Taylor to be deprived of the right . . . . to be free from unreasonable searches and seizures." Sup. Indictment, DN 52, at Count One. It also alleges that that the officers who executed the warrant completed that crime. *Id.* at ¶ 9 and ¶ 37 (taken together, these paragraphs allege entry into Taylor's home without a warrant supported by probable cause).

Next, § 242's second clause, the ten-year penalty enhancement, asks whether the actions that comprised the crime (whether "the acts committed in violation of this section") included the "use, attempted use, or threatened use of a dangerous weapon." It does so by employing the phrase "the acts committed in violation of this section" to refer back to the crime defined in the first clause and the phrase "such acts" to also refer back to the "acts committed in violation of this section." The second clause reads:

> . . . if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon . . . .

---

[4] The first clause also requires that Defendants acted "under color of any law." Police officers possess power by virtue of state law. Thus, when carrying out their office, they are said to "act under color of law." *Screws v. U.S.*, 325 U.S. 91, 109 (power "'made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law.'") (quoting *U.S. v. Classic*, 313 U.S. 299, 326 (1941)).

18 U.S.C. § 242. Because "use" means active employment of a weapon, read together, the first two clauses of § 242 require the Government to prove that officers actively employed weapons to complete a § 242 crime, *i.e.*, to subject Taylor to a rights deprivation. At the pleading stage, these clauses require the Government to allege facts that meet these requisites. Again, not just any active employment of a weapon will do. The use to which the weapon is put matters.

The Government relies on two fact allegations to charge Jaynes and Meany with aiding and abetting the "use of a dangerous weapon": the on-scene officers' "(1) brandishing their weapons to execute the warrant and (2) firing their weapons after officers surprised an armed occupant in the home." Sup. Indictment, DN 52, at Count One. Defendants, via Meany's Motion, argue that the officers' return fire is not "use of a dangerous weapon" because it was not part of committing a § 242 crime. Instead, it was an independent act of self-defense. The Government asserts that the return fire constitutes § 242 "use" because it "was the direct and foreseeable result of the defendant's conduct . . . ." Resp., DN 63 at n.1.

The Government's foreseeability argument misses the mark. It conflates pleading § 2(b) intent with pleading "use" under § 242. Aiding and abetting under § 2(b) requires allegations that each defendant "willfully caused" a § 242 crime. Whether a defendant has "willfully caused" a crime may be shown by alleging and proving that he knew or foresaw that the conduct constituting the crime would take place. *See Murph*, 707 F.2d at 896 (defendant could be convicted of aiding and abetting § 287 crime despite his not having personally filed false tax return because he foresaw that buyer of false return would file it). Such aiding and abetting intent, however, is only one part of the use-of-a-dangerous weapon charge in this case. In addition to that intent, to plead the felony offense under the ten-year penalty enhancement, the Government must plead not only a § 242

crime but also the active use of a dangerous weapon to commit that § 242 crime. On this issue, Defendants are correct, the officers' return fire does not suffice.

The on-scene officers did not fire their guns to carry out a § 242 crime. They did not fire their weapons to gain entry into Taylor's apartment or to gain her compliance with a search in any other way. They fired in self-defense. The allegations are that officers had already entered Taylor's apartment before they fired their guns. Further, the officers **returned fire**, shooting only after K.W. shot and hit one of them in the leg:

> Moments after the door flew open and the first officer pointed his handgun into Taylor's home, K.W., standing near the entrance to Taylor's bedroom and believing that intruders were breaking in, fired one shot with his handgun, hitting an officer at the front door in the leg. Two LMPD officers immediately responded by firing a total of 22 shots into the apartment. Multiple shots hit Taylor, and one of those shots hit her in the chest.

Sup. Indictment, DN 52, at ¶ 38. These allegations show that self-defense was the use to which the officers put their guns when they fired them. They did not use them to carry out a § 242 crime.

The Government also relies on the allegation that on-scene officers "brandished" their guns to execute the warrant. This allegation appears in Count One. In addition to it, the Government relies on paragraphs 14, 35, and 37 of the Superseding Indictment, arguing that the allegations in those paragraphs establish that officers "brandished," and thus "used," their firearms to execute the misbegotten warrant. Resp., DN 63, at PageID# 1169. Defendants assert that the opposite is true. More particularly, Meany argues that the on-scene officers were following policy regulations and had their weapons out for self-protection. He contends that the current allegations require this conclusion. He points out that the Superseding Indictment alleges Taylor was asleep when police entered her apartment, so she did not hear or see any guns before they entered or upon their entry. That is, the officers' guns were not pointed at Taylor and, thus, the only purpose that could be served by their being drawn upon entry was self-protection. Mot., DN 61, at PageID# 1049.

19

The Government urges the Court to reject this self-protection argument because the proof will show that officers had two purposes in brandishing their weapons. One was self-protection, yes, but the second was "to induce compliance with police commands and ensure the occupants would permit officers to enter and search." Resp., DN 63, at PageID# 1181-82. This second purpose is a fact question relating to intent and thus cannot be resolved now, according to the Government. *Id.* at PageID# 1182. The Court disagrees. Section 242 asks what happened. Not what officers intended to do but never did do. Thus, while using a gun to gain Taylor's compliance with the search could be "use" under § 242, the allegations make clear that officers never reached such a crossroads. Taylor never became the conscious object of their having brandished their guns.

The Superseding Indictment alleges that Taylor was asleep when police knocked and announced. She did not hear them demand entry. *Id.* at ¶ 36. Nor were any additional commands ever given to her. Accordingly, while officers may have intended to use their guns to gain Taylor's compliance, they simply never got that far. There is nothing in paragraphs 14, 35, or 37 that suggests otherwise. Paragraph 14 asserts that Defendants "knew officers would brandish weapons to execute the warrant." *Id.* Couched in terms of what Defendants understood would happen, this allegation first goes to § 2(b) intent. With respect to what happened, the allegation does no more than imply that at some point, officers "brandished" weapons. It goes no further. There is nothing on which to conclude that officers pointed their weapons at Taylor much less that she perceived those weapons being drawn against her and so complied with police commands as a result.

Paragraph 35 similarly falls short. It alleges that officers "lined up in an entryway near Taylor's door," "drew and brandished their weapons," then knocked on Taylor's door and demanded entry. *Id.* Paragraph 36 makes plain that Taylor did not witness this "brandishing" of firearms because she was asleep in a back bedroom: "Inside the home, Taylor and K.W. had fallen

asleep in Taylor's bedroom . . . at the back of the two-bedroom apartment, at the end farthest away from the front door." *Id.* Thus, at this point, the officers could not have been using their guns "to induce compliance with police commands and ensure that the occupants of the residence would permit officers to enter and search." Resp., DN 63, at PageID# 1182. Rather, of the dual purposes the Government identifies, the officers could only have been using their guns as a safety precaution, *i.e.*, for self-protection.

Paragraph 37 alleges that "[s]everal officers with guns drawn stepped forward into Taylor's open doorway" and that the "first officer . . . pointed his handgun into Taylor's home." *Id.* Clearly, no weapon was pointed at Taylor such that she saw it and so acquiesced to police entering her apartment. Thus, and contrary to the Government's argument, the allegations do not show that officers used their guns "to force entry" into Taylor's apartment. Resp., DN 63, at PageID# 1179. Nor are there allegations that officers induced Taylor's compliance after they entered by brandishing weapons. The only alleged command was given outside her door, prior to entry when the officers "demanded entry into her home." *Id.* at ¶ 35. Again, according to the allegations, Taylor was asleep and did not hear this demand. *Id.* at ¶ 36. Moreover, the allegations are that K.W. fired at the officers "moments" after they entered Taylor's apartment, drawing immediate return fire. Sup. Indictment, DN 52, at ¶ 38. Additionally, the Government argues that "Taylor was killed almost immediately upon entry by police." Resp., DN 63, at PageID# 1188. Thus, the allegations and the Government's argument reveal that officers did not give any post-entry commands to Taylor.

Meany is also correct in his assertion that Count One ineffectively substitutes the word "brandish" for the word "armed." Indeed, this substitution does not rescue the Government's pleading. To the contrary, it undermines the Government's case. "Brandish" means "to shake or

21

wave (a weapon) menacingly." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 268 (Philip B. Grove, *et al*) (1986). "Menacingly" means threateningly. *Id.* at 1409; *see also* Bryan A. Garner, Garner's Modern English Usage 118 (4th Ed. 2016) ("brandish" means "to wave or shake in a menacing or threatening way"). The word "'threat' and its cognates usually denote 'a communicated intent to inflict physical harm or other harm on any person or on property.'" *U.S. v. Taylor*, 596 U.S. 845, 854-55 (2022) (construing threatened use of force under 18 U.S.C. § 924(c)). Accordingly, brandishing a gun means to threaten someone with it—to communicate, either verbally or nonverbally, an intent to inflict physical harm. *Id.* at 855. Pointing a gun at someone would communicate such a threat. *Id.* Waving a gun about to gain someone's compliance with a verbal command would also communicate such a threat. The key in each situation is that a communication takes place. That is, the threat, the presence of the gun, is not only made manifest but it is also perceived by someone who is the object of that manifestation. Here, there are no allegations that police directed a gun at Taylor to induce her compliance by means of such a threat.

Finally, contrary to the Government's argument, the new allegations do not liken this case to either *U.S. v. Acosta*, 470 F.3d 132 (2nd Cir. 2006) or to *U.S. v. Rodella*, 804 F.3d 1317 (10th Cir. 2015). In *Acosta*, police conducted armed robberies, using their guns to "rob and intimidate" drug dealers. 470 F.3d at 135. That is, police inspired fear in their victims by threatening them with their weapons. In the other case, sheriff Rodella chased a confused driver down a dirt road, forcibly entered the driver's vehicle with a .38 Special in his hand and "kept trying to turn the gun toward" the driver while they struggled. Throughout, the driver repeatedly begged, "Please don't kill me." 804 F.3d at 1322. The communicated threat was there. Sheriff Rodella not only drew his weapon but tried to aim it toward the driver who perceived a threat to his life. No like fact allegations exist in this case.

**B. The Death-Results-From Charge**

The Government alleges that Defendants are subject to § 242's second penalty enhancement based on Taylor's death. That penalty enhancement applies if Taylor's death resulted from the acts committed in violation of § 242. 18 U.S.C. § 242 ("if death results from the acts committed in violation of this section . . . ."). Based on this language, the Government must allege and prove specified conduct (acts that violated § 242) caused a specified result (someone's death). When a crime requires "'not merely conduct but also a specified result of conduct,'" a defendant generally may not be convicted unless the conduct is both the actual and proximate cause of the result. *Burrage v. U.S.*, 571 U.S. 204, 210 (2014) (citation omitted). Thus, the Government must plead facts which establish that Taylor was subjected to the deprivation of a right secured by federal law (the specified conduct) and facts which show that the deprivation was both the actual and proximate cause of Taylor's death (the specified result).

Count One charges that Taylor was "deprived of the right . . . to be free from unreasonable searches and seizures." Sup. Indictment, DN 52, at PageID# 954. That is a right secured by the Fourth Amendment to the Constitution. It also charges that this "offense resulted in Taylor's death." *Id.* at PageID# 955.[5] More specifically, the Government has alleged two Fourth Amendment violations: (1) defendants "*obtained* a warrant without probable cause" and (2) defendants "*violated Taylor's constitutional rights* through an unreasonable search that they knowingly sent officers to carry out in a dangerous manner." Resp., DN 63, at PageID# 1170 (emphasis in original). Lacking a valid warrant and an unreasonable manner of carrying out a search are distinct Fourth Amendment violations. They must be treated separately. *Mendez*, 581

---

[5] Defendants moved to dismiss the same charge from the original Indictment based on a proximate cause argument. In response, the Government argued that it did not need to prove proximate cause, only actual cause. The Court held that § 242 requires proof of both. Apparently, the Government now agrees, forgoing its previous assertion.

U.S. at 431-32. Thus, in addition to pleading facts that establish a prima facie case for each of these two violations, the Government must also allege facts which show that each particular violation was both the cause in fact (actual cause) and the proximate cause of Taylor's death.

### 1. Entry without a Warrant Supported by Probable Cause

The Fourth Amendment safeguards personal privacy by barring arbitrary searches of one's home and personal effects by government actors. To that end, it establishes that the government, including law enforcement, cannot enter a person's home without good reason. Accordingly, in most instances, police need a warrant to conduct a search. Further, a warrant must be supported by probable cause, meaning a reasonable belief that a crime has been committed or that evidence of a crime will be found. These safeguards are embodied in this language: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend IV; *see also* PROBABLE CAUSE, Black's Law Dictionary (12th ed. 2024) ("A reasonable ground to suspect that a person has committed or is committing a crime or that a place contains specific items connected with a crime."). There are exceptions to the warrant requirement. For example, a person may consent to a search or exigent circumstances may exist that demand immediate entry. Absent an exception, however, if police do not have a warrant supported by probable cause but search anyway, they violate the Fourth Amendment. *Steagald v. U.S.*, 451 U.S. 204, 212 (1981).

Like the original Indictment, the new indictment alleges there was no probable cause for a search of Taylor's apartment, so Defendants lied in order to convince a judge that probable cause did exist and thereby obtain a search warrant. Sup. Indictment, DN 52, at ¶¶ 9-13. The warrant issued. *Id.* at ¶ 13. Police executed the warrant and entered Taylor's apartment. *Id.* at ¶ 37. Thus, according to the charges, police entered Taylor's apartment without a valid warrant and so subjected Taylor to a violation of her Fourth Amendment rights. Defendants do not challenge this prima facie case of a Fourth Amendment violation. Rather, they contend that the Superseding

Indictment, like the original Indictment, does not contain fact allegations which show that the lack of probable cause for a search was both the actual cause and the proximate cause of Taylor's death. Consequently, the Court should again dismiss.

The Government asserts that the opposite is true. According to the Government, the new allegations "unequivocally plead" actual cause. Resp., DN 63, at PageID# 1182. The Government contends that they do so "by alleging that absent the defendants knowingly submitting a false warrant affidavit," no warrant would have issued 'and there would have been no search at Taylor's home'—and thus no exchange of gunfire that killed Taylor." *Id.* (citing Sup. Indictment at ¶ 13). Paragraph 13 does make that allegation:

> . . . If the Judge had been aware that key statements in the affidavit were false and misleading, she would not have approved the warrant for Taylor's home and there would have been no search at Taylor's home.

Sup. Indictment, DN 52, at ¶ 13. While this allegation establishes that if one event (obtaining a warrant) had not happened another event (its execution) would not have taken place, it elides what is causally relevant. The allegation does not establish a causal relation between that aspect of the defendants' conduct that is illegal (the lack of probable cause) and the injury. The actual cause standard requires that it do so. *Burrage*, 571 U.S. 204.

The application of the traditional but-for, actual cause test illustrates this point. That test requires the Court to determine whether the injury would have occurred but for the illegal conduct. *Paroline*, 572 U.S. at 449-50 (traditional way to prove that one event was factual cause of another "is to show that the latter would not have occurred 'but for' the former"); *Powers*, 501 F.3d at 608. To answer this question, courts remove the unlawful component and picture whether the injury would have happened anyway. When that test is applied here, it shows that Taylor would have been shot (the result) even if the warrant were supported by probable cause (without the conduct complained of). That is, the existence of probable cause would not have prompted anyone to act

differently and so would not have altered the outcome. Ostensibly, Taylor and K.W. would still have been asleep in a back bedroom, would still have failed to hear police demanding entry, and K.W. would still have been startled into shooting at police who still would have returned fire. Meany and Jaynes argue that the Superseding Indictment fails to prove actual cause for this reason. The Court agrees.

Nonetheless, even if the Government is the correct party here and it has pleaded actual cause, the analysis would not end there. The Superseding Indictment must also plead proximate cause. On this point, the Government's allegations and arguments likewise fail to address the relevant Fourth Amendment violation: the lack of a warrant supported by probable cause. Instead of doing so, they address the contention that defendants sent "a different group of officers to execute the warrant in a dangerous manner, in violation of 18 U.S.C. § 242 . . . ." Resp., DN 63 at PageID# 1170. This assertion conflates two distinct Fourth Amendment violations: (1) risks associated with manner of search violations and (2) risks associated with entering without a valid warrant, effectively a warrantless entry. As a result, the Government's proximate cause argument misses the mark. *Mendez*, 581 U.S. at 431-32.

As a further result, the Court is left with the same set of fact allegations that failed to plead proximate cause in the first instance. The relevant Fourth Amendment violation is entering Taylor's apartment without probable cause: a violation of the warrant clause. Consequently, and as the Court previously explained, the proximate cause question becomes whether Taylor's death bore some direct relation to the purpose served by the warrant clause. Again, it does not. The warrant clause's purpose is to protect privacy, not life and limb. Stated in terms of foreseeability, one can foresee that a violation of the warrant clause, searching someone's home without probable cause, will result in an illegal invasion of privacy by the government who has no right to be there,

but it is not axiomatic, probable or likely that a lack of probable cause will result in someone's death. *See infra* at § I.B; 08/22/224 Mem. Opinion at PageID# 926-28. Thus, the relevant § 242 crime—entry without a warrant supported by probable cause—is not the proximate cause of Taylor's death.

### 2. Manner of Execution Allegations

The Government asserts that defendants "*violated Taylor's constitutional rights* through an unreasonable search that they knowingly sent officers to carry out in a dangerous manner." Resp., DN 63, at PageID# 1170 (emphasis in original). More specifically, the Government alleges:

> . . . defendants "*knew that officers would execute the warrant at Taylor's home in a manner* that would create a dangerous situation both for the officers who carried it out and for anyone who happened to be in Taylor's home, *including a risk that the executing officers would exchange gunfire* with [K.W.]."

*Id.* at PageID# 1174 (emphasis in original) (quoting Sup. Indictment at ¶ 33). As to how defendants created a dangerous situation, the Government points to "30 paragraphs of new information." Resp., DN 63, at PageID# 1183-84. According to the Government,

> These allegations make a prima facie showing that the defendants proximately caused Taylor's death, as they clearly allege that the defendants knew the execution team's "entry may provoke violence in supposed self-defense by the surprised resident," and thus that a gunfight was a "natural and probable result" of the defendant's conduct.

*Id.* (partially quoting *Hudson*, 547 U.S. at 594).

Among the "30 new paragraphs" are allegations to the effect that defendants knew but did not tell their fellow officers that K.W. might be in Taylor's apartment and he had a concealed carry permit, nor did they provide them with a description of K.W.'s car so that they could be on the lookout for him. Such allegations might add up but for the fact that the new charges also reveal that officers knocked and announced before they entered Taylor's apartment:

> . . . the officers on the execution team lined up in an entryway near Taylor's door around 12:40 a.m. on March 13, 2020, drew and brandished their weapons, ***knocked on her door, and demanded entry into her home***.

Sup. Indictment, DN 52, at ¶ 35 (emphasis added). The express allegation that officers knocked and announced is new. The original Indictment was silent on this issue. In prior argument, the Government represented that officers knocked but whether they announced was in dispute:

> The officers knocked loudly on the door several times and did not receive a response. The Government anticipates that there will be dispute about ***whether*** and how loudly the officers announced themselves as police . . . .

Resp., DN 40, at PageID# 847-48 (emphasis added). Additionally, the new, express allegations show that it was only after officers got no response that they forcibly entered Taylor's apartment: "when no one answered the officers' knocks, an officer with a heavy metal ram broke down the door to the apartment." Sup. Indictment, DN 52, at ¶ 37.

These allegations are presumably based on testimony and/or other evidence presented to the grand jury who voted to indict defendants based, in part, on such evidence.[6] And, on a motion to dismiss, the Court must take the allegations as true. *Reed*, 77 F.3d at n.1. Together, the allegations demonstrate that officers complied with the Fourth Amendment's knock-and-announce rule. When officers comply with the knock-and-announce rule, there is no Fourth Amendment violation. Instead, their manner of search is deemed reasonable under the Fourth Amendment. *Finch*, 998 F.2d at 353 (18 U.S.C. § 3109 codifies knock-and-announce rule and defines manner of search that is reasonable under Fourth Amendment."). As well, it is the Fourth Amendment's knock-and-announce rule that safeguards life and limb. *Hudson*, 547 U.S. at 593–94 (knock-and-announce rule protects "human life and limb, because an unannounced entry may provoke violence

---

[6] A grand jury is a group of citizens who review evidence of suspected criminality to decide whether criminal charges are warranted. Twelve grand jurors must agree in order to return formal charges, also known as the indictment. FED. R. CRIM. P. 6(f).

in supposed self-defense by the surprised resident."). Moreover, the fact that neither K.W. nor Taylor heard the officers announce themselves "is not to the point." *U.S. v. Banks*, 540 U.S. 31, 39 (2003). It is the facts known to police at the scene which matter. *Id.* Here, the Government has stated that police did not break down Taylor's door until after they knocked, announced, and did not hear a response: "Outside the apartment, when no one answered the officers' knocks, an officer with a heavy metal ram broke down the door to the apartment." Sup. Indictment, DN 52, at ¶ 37. Based on these new allegations, police entered Taylor's apartment in a reasonable manner by satisfying the Fourth Amendment's knock-and-announce rule. Thus, the Superseding Indictment fails to state a claim for a violation of the Fourth Amendment due to an unreasonable manner of entry.

The absence of a manner-of-search Fourth Amendment violation means there is no need to address proximate cause. There is no underlying § 242 crime to which to attribute Taylor's death. By contrast, had there been an unreasonable manner of entry, had police ***not*** taken the precaution the Fourth Amendment requires, the defendants' pre-search conduct might be causally relevant. That is, if officers fail to knock and announce and violence erupts, the proximate cause question might be for a jury, depending on the totality of the circumstances.[7] This is so because preventing violent encounters is among the reasons for requiring officers to knock and announce. *Hudson*, 547 U.S. at 593–94.

To illustrate, according to the Superseding Indictment, the officers at the scene possessed a no-knock warrant, one they believed to be valid.  DN 52 at ¶ 34. Had they then forgone knocking and announcing in ignorance of K.W.'s likely presence and his concealed carry permit, then the

---

[7] *Hill v. McIntyre*, 884 F.2d 271, 277 (6th Cir. 1989) ("the test for the entry itself and all subsequent conduct is whether these are reasonable."); *Mendez*, 581 U.S. at 427-28 (Whether police were reasonable requires analyzing the "totality of the circumstances.").

defendants' alleged purposeful withholding of that information might be causally relevant in the eyes of a jury. For, according to the Government, the danger to be averted was the risk to life and limb caused by the element of surprising someone who had a gun. Resp., DN 63, at PageID# 1184. Concealing facts that would cause the on-scene officers to act so as to avert surprising such a person, to cause them to knock and announce despite the no-knock warrant, might become causally relevant. One could plausibly then argue that it was unreasonable to expose Taylor to the risk of a violent encounter that might have been avoided by an announced entry. Such a set of facts is not before the Court, however. Rather, in this case, officers knocked and announced. They did what the Fourth Amendment requires for the protection of life and limb.

The other fact allegations on which the Government relies to attribute Taylor's death to defendants Jaynes and Meany are also problematic. The Government alleges that the defendants created dangerous circumstances that made a gunfire exchange foreseeable. The new allegations assert that defendants knew Kentucky was a "stand your ground" state with no duty to retreat. Sup. Indictment, DN 52, at ¶ 15. Yet, such knowledge would not be exclusively known to the defendants, nor is it a condition that they created. Additionally, the Government alleges that Jaynes and Meany purposefully evaded involving SWAT despite LMPD policy which required SWAT to execute the warrant. *Id.* at ¶¶ 22-31. It also alleges that the non-SWAT officers who executed the warrant were "less prepared to deal safely" with K.W. *Id.* at ¶ 28. Yet, there are no allegations as to what SWAT members would have done differently and none to suggest that what the non-SWAT officers did do (knocking, announcing and waiting before they broke through Taylor's door) was unreasonable under the circumstances.

Further, Jaynes' and Meany's subjective motivations, even if they were "evil," will not make a Fourth Amendment violation out of the on-scene officers' objectively reasonable conduct.

*Graham v. Connor*, 490 U.S. 386, 397 (1989) (citations omitted). For this reason, the Government cannot state a Fourth Amendment violation based solely on allegations as to what defendants Jaynes and Meany knew, said, or failed to say before the Taylor warrant was carried out, even if such allegations constitute a motive to execute the Taylor warrant despite known risks. *Id.* (subjective motivations of individual officers have no bearing on whether particular seizure is "unreasonable"). The conduct at the scene must be judged under an objective standard: "reasonableness . . . must be judged from the perspective of a reasonable officer on the scene." *Id.* at 396. Because it omits consideration of what happened at the scene, the Government's liability theory comes up short.

That omission may also stem from a focus on establishing § 2(b) aiding and abetting intent with respect to a Fourth Amendment, manner-of-search violation. To establish that intent, the Government may show that defendants Jaynes and Meany knew the search would be conducted in an unreasonable manner. Under the Fourth Amendment, "the test for the entry itself and all subsequent conduct is whether these are reasonable." *Hill*, 884 F.2d at 277. The key notion in the Government's argument and allegations is that Jaynes and Meany "knew" the warrant would be executed "in a dangerous manner." Resp., DN 63, at PageID# 1174; Sup. Indictment at ¶ 33. This phrasing closely aligns with showing § 2(b) intent because it alleges that the defendants recognized that a manner-of-search violation would occur. *Murph*, 707 F.2d at 896. However, what Jaynes and Meany thought would happen only pertains if what did happen constituted a violation of Taylor's Fourth Amendment rights. The crime must be completed. There must be both intent and an unlawful act. *Lester,* 363 F.2d at 73.

Finally, the officers' return gunfire itself was not unlawful and thus does not constitute an unreasonable seizure under the Fourth Amendment. An officer's use of deadly force in response

to life-threatening conduct does not violate the Fourth Amendment. *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (citing *Garner*, 471 U.S. at 11-12); *see also Bills v. Aseltine*, 958 F.2d 697, 704 (6th Cir. 1992) (officers "may take such reasonable action as is necessary to protect themselves during the search."). Indeed, the Government has previously pointed out that the officers who returned K.W.'s fire have not been charged with any crimes. Resp., DN 40, at n.1.

On March 13, 2020, police "lined up in an entryway near Taylor's door around 12:40 a.m." Sup. Indictment, DN 52, at ¶ 35. They "knocked on her door, and demanded entry into her home." *Id.* "Outside the apartment, when no one answered the officers' knocks, an officer with a heavy metal ram broke down the door to the apartment." *Id.* at ¶ 37. "Moments after the door flew open," K.W. "fired one shot with his handgun, hitting an officer at the front door in the leg." *Id.* at ¶ 38. Two officers returned fire, fatally wounding Taylor. *Id.* at ¶¶ 38-39. These allegations show that the entry made by the officers at the scene complied with the Fourth Amendment. They knocked, announced and waited before they forcibly entered. *Finch*, 998 F.2d at 353. They also show that the officers fired only when fired upon, also legal conduct under the Fourth Amendment. *Dickerson,* 101 F.3d at 1163; *Bills*, 958 F.2d at 704. As a result, there is no Fourth Amendment violation to which to attribute Taylor's death. Even if there were, the law of superseding cause directs that Taylor's death be attributed to K.W.'s opening fire. His exercise of lethal force usurped control over the circumstances, drawing the return fire that caused Taylor's death. As such, it is the legal cause of Taylor's death.

### 3. Superseding Cause

Defendants assert that "Sixth Circuit precedent unequivocally categorizes [K.W.'s] conduct as a superseding cause that cuts off any potential liability of others for Taylor's death." Mot., DN 61, at PageID# 1055. The Government contends that this argument amounts to the assertion that under no set of facts could the defendants be held liable for Taylor's death. Resp.,

DN 63, at PageID# 1186. The Court disagrees. Defendants have not asserted that there are no possible set of facts under which they might have been liable for Taylor's death. Instead, they argue that given the set of facts pleaded by the Government and given the law of superseding cause, K.W.'s conduct is the legal cause of Taylor's death. The Court agrees. *See* 08/22/2024 Mem. Opinion at PageID# 930-32 (discussing superseding cause with attention to *Estate of Sowards*, 125 F. App'x 31 and *Whitlow*, 39 F. App'x 297).

The cases cited by the Government in its Response do not require a different conclusion. Further, contrary to the Government's argument, those cases do not stand for the proposition that a jury must decide whether K.W.'s conduct is a superseding cause and thus the legal cause of Taylor's death. The Government cites *Hudson*, 547 U.S. at 594, for this proposition: "a surprised resident shooting at the police does *not* sever the chain of causation because it is foreseeable that 'an unannounced entry may provoke violence in supposed self-defense by the surprised resident.'" Resp., DN 63, at PageID# 1187 (emphasis in original). The Government cites *Rush v. City of Mansfield*, 771 F. Supp.2d 827 (N.D. Ohio 2011) for the same proposition. *Id.* at PageID# 1187-88. There is no unannounced entry in this case. The Government has pleaded that the opposite is true: police knocked and announced. Sup. Indictment, DN 52, at ¶ 35. Again, that K.W. did not hear them is not to the point. *Banks*, 540 U.S. at 39. Further, *Hudson* does not discuss superseding cause. *Hudson* held that a violation of the knock-and-announce rule does not require the suppression of evidence found in the search because suppression did not serve the interests protected by knock-and-announce rule. 547 U.S. at 594.

Next, the Government cites *Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018). In that case, after busting into a backyard shed unannounced, police misunderstood what they saw. They fired upon the occupant who had moved a BB gun in his confused effort to get up from a

futon on which he had been napping. Similarly, in *Attocknie v. Smith*, 798 F.3d 1252 (10th Cir. 2015), a police officer burst into a house and immediately fired upon the occupant who was allegedly holding a knife and who was not the object of the arrest warrant the officer was meant to execute. Here, there was no such misapprehension by police and they did not open fire as a result of any misapprehension. Instead, K.W. opened fire on the police, hitting one of them in leg. They returned fire in response to K.W.'s lethal conduct.

Further, contrary to the Government's assertion, *Bodine v. Warwick*, 72 F.3d 393 (3rd. Cir. 1995) does not hold that superseding cause is necessarily an issue for a jury to decide. Plaintiff Bodine raised three Fourth Amendment claims. Two are pertinent here: (1) illegal entry because police violated the knock-and-announce rule and (2) excessive force. The district court granted Bodine a judgment as a matter of law on the illegal entry claim. The Third Circuit Court of Appeals held that the district court erred in doing so because whether police entered illegally presented a question for the jury. It was a jury question because that issue turned on "sharply conflicting evidence." *Id.* at 396. The Court also held that "the jury should have been permitted to decide whether the troopers' use of force was excessive." *Id.* at 400. That issue also turned on sharply different accounts of the events. *Id.* The district court had wrongly instructed the jury that because the entry was illegal any subsequent use of force would be unreasonable. *Id.*

At the same time, the Court of Appeals held that, even if the entry were illegal, police would not necessarily be liable for all of the harm that followed. *Id.* "And they certainly would not be liable for harm" caused by "the use of reasonable force to arrest Bodine." *Id.* The Court then illustrated its point by explaining if a suspect shoots at police, kills two, and a third officer disarms the suspect but injures him in that process, that third officer would not be liable for the suspect's injuries. The third officer would not be liable because "[t]he suspect's conduct would constitute a

34

superseding cause that would limit the officers' liability." *Id.* (citation omitted). This rationale does not suggest that superseding cause necessarily presents a jury question. It suggests the opposite. Here, there is no dispute that K.W. opened fire on police. There is no dispute that the officer's return fire which struck Taylor was a reasonable use of force. Thus, under *Bodine's* rationale, K.W.'s conduct is a superseding cause that limits the defendants' liability.

In *Betker v. City of Milwaukee*, 22 F. Supp.3d 915 (E.D. Wis. 2014), on which the Government also relies, the defendant argued that "because he could not predict with certainty the chain of events that led to plaintiff's damages, the damages should be regarded as unforeseeable." *Id.* at 923. The district court found that the law in the Seventh Circuit did not require "that the exact consequence from an act be foreseen." *Id.* There is no indication that the defendant made a superseding cause argument or sought a jury instruction on superseding cause. Finally, the Government cites to a guilty plea entered in a case that was before the district court for the Northern District of Georgia, styled *U.S. v. Junnier, et al,* No. 1:07-cr-0129. In no way does a guilty plea stand for the proposition that a jury must decide whether superseding causes exists.

Finally, the Government contends that both *Napper*, 617 F. Supp.3d 703 and *Whitlow*, 39 F. App'x 297 show that causation cannot be decided as matter of law:  "Two cases heavily cited by the defendants further demonstrate that causation is a fact-dependent question—not one that can be answered as *a matter of law* irrespective of any facts that may be introduced at trial." Resp., DN 63, at PageID# 1188 (emphasis in original). In *Napper*, the district court granted a motion to dismiss. In *Whitlow*, the district court granted a motion for summary judgment and the Court of Appeals affirmed. Thus, in both cases, the failure to sufficiently plead causation or to establish causation was decided as a matter of law.

## CONCLUSION

The Superseding Indictment alleges that Defendants, Joshua Jaynes and Kyle Meany, "knew that the affidavit they used to obtain the warrant to search Taylor's home contained information that was false, misleading, and out-of-date; that the affidavit omitted material information; and that the officers lacked probable cause for the search." Sup. Indictment, DN 52 at ¶ 9. Based on those falsehoods, a Jefferson Circuit Court judge issued a no-knock warrant for Taylor's apartment. *Id.* at ¶ 13. On March 13, 2020, police executed that warrant and entered Taylor's apartment without probable cause to do so. Taken as true, these averments allege aiding and abetting a violation of § 242 which criminalizes subjecting a person to a constitutional rights violation.

Next, the Court must assess the distinct Fourth Amendment claim, the one based on the way the warrant was executed, separately, by examining the reasonableness of the on-scene officers' conduct. In doing so, the Court must appreciate the risks facing the police officers at the time and be careful to avoid over scrutinizing those decisions with the "20/20 vision of hindsight" "in the peace of a judge's chambers." *Graham*, 490 U.S. at 396 (internal quotation marks omitted). The Superseding Indictment alleges that on March 13, 2020, police "lined up in an entryway near Taylor's door around 12:40 a.m." DN 52 at ¶ 35. They "knocked on her door, and demanded entry into her home." *Id.* "Outside the apartment, when no one answered the officers' knocks, an officer with a heavy metal ram broke down the door to the apartment." *Id.* at ¶ 37. These allegations show that the on-scene officers' entry into Taylor's apartment complied with the Fourth Amendment. *Finch*, 998 F.2d at 353.

Despite possessing a no-knock warrant, the on-scene officers decided to knock and announce. They did what the Fourth Amendment requires for the protection of life and limb. K.W. opened fire when they came through the door and hit one of the officers in the leg, thereby usurping

the officers' control over the circumstances. Two officers who had entered the apartment returned fire in self-defense, fatally wounding Taylor. Police did not misapprehended the danger to themselves, and their return fire was legal conduct. Thus, the on-scene officers' manner of entry and subsequent conduct did not violate Taylor's Fourth Amendment rights. Consequently, the Superseding Indictment pleads aiding and abetting only one § 242 crime: entry into Taylor's apartment without probable cause in violation of her Fourth Amendment rights.

As for the alleged felony offenses, even if the Court considers both potential Fourth Amendment violations (illegal entry and illegal manner of search), those alleged § 242 crimes did not "include the use of a dangerous weapon." Officers did not "brandish" their guns to gain Taylor's agreement to let them into her apartment or to gain her submission to a subsequent search. Nor did they fire their weapons for those purposes. Instead, they fired in self-defense. Nor was the lack of probable cause to enter or the manner of entry, the legal cause of Taylor's death. K.W.'s opening fire became the proximate, *i.e.,* the legal, cause of Taylor's death because that exercise of lethal force usurped control over the circumstances and directly led to Taylor's fatal wounding by drawing return fire.

Accordingly, Defendants' Motions to Dismiss (**DN 61** and **DN 62**) are **GRANTED**. The final sentence of Count One of the Superseding Indictment is hereby **STRICKEN** and the felony charges against defendants Jaynes and Meany are hereby by **DISMISSED without prejudice**. Further, to the extent that the Superseding Indictment charges defendants Jaynes and Meany with violating 18 U.S.C. §§ 242 and 2(b) based on the alleged manner of search—based on the police's alleged manner of entry into Taylor's apartment or subsequent conduct by the police or both—that charge is hereby **DISMISSED without prejudice**. As a result, the remaining charge in Count One of the Superseding Indictment is a violation of 18 U.S.C. §§ 242 and 2(b) based on the

Government's allegations that police entered Taylor's apartment without a warrant supported by probable cause in violation of her Fourth Amendment rights and defendants Jaynes and Meany willfully caused that violation of Taylor's rights.

**IT IS SO ORDERED**.